and Ennis and Molinelli. Appearance, please. Good morning, Ron. May it please the Court, Heather Fierro, Clifford Lazaro and Associates, representing the appellant Maria Jose Carrascosa. I will be arguing the issues of the analysis under the Hague Convention. Mr. Shestad, counsel for Amicus Valencia Spain, will be arguing the errors of the Vicious Court comedy and due process. Counsel, would you bring that microphone a little closer to your mouth, please? Thank you. Yes, sir. You've got a judge that has two hearing aids. I'm a little short. I stand before the Court today on behalf of Maria J. Carrascosa, who is not a criminal, but a mother, incarcerated for over one year for contempt of New Jersey family court orders, directing her to return the party's daughter, Victoria Solemn, in South New Jersey from Spain, where she was removed in January 2005. When you say she was removed, and you put that in the past tense, is it more accurate to say that your client took her in violation of both New Jersey law and an explicit contract out of the country, and that Victoria is in Spain, and her passports are in possession of the Spanish court because of what Ms. Carrascosa decided to do in the face of both the law and an agreement? When Ms. Carrascosa took Victoria to Spain, there was no order preventing her from doing so from any court, Your Honor. There was, in fact, a parenting agreement. That parenting agreement was signed on October 8, 2004, and this was signed prior to the filing of the divorce complaint. That parenting agreement is a valid agreement, as found by the New Jersey courts and the Spanish courts as well. But if we analyze the terms of that parenting agreement under the Hague Convention, that's a me exe at right, not a custody right. Did the agreement provide for custody? Did it mention custody? The agreement didn't specifically state custody, Your Honor. What it did was it indicated that Mr. Innes would have parenting time, which would be the same as rights of access under the Hague Convention terms, every other weekend beginning Friday to Saturday and then progressing perhaps Friday to Sunday, every other weekend. The intent of taking the child to Spain was, of course, to deprive him of access to the child and, in effect, altered the custody status, didn't it? Well, the custody status was that Ms. Carascosa, as analyzed under the Hague and the parenting agreement, was that Ms. Carascosa was the custodial parent. Well, under New Jersey law, doesn't the New Jersey law provide that both parents have equal custody, absent a court order? Absent a court order or other valid binding agreement. So what other valid binding agreement was there? I mean, the appellate division of the New Jersey court system looked at this and said the state of the law is clear under New Jersey law, both these parents had equal rights, equal custody. So removing the child was a violation of Mr. Innes' custody rights. Where's the legal flaw in that reasoning? Well, both parents would have custody rights if there wasn't an agreement or order limiting those custody rights. And we submit that the Spanish courts analyzed this under the terms of the Hague Convention and New Jersey law. And they used New Jersey law in that they analyzed the parenting agreement, which is exactly what they were supposed to do. That parenting agreement limited Mr. Innes' rights to access rights, not custody rights. I don't follow that. I mean, the parents split. The child has to stay with one of the parents. The other parent gets visitation. Does that automatically mean that there is a limitation of custody? I think that the way that the Spanish courts analyzed it under the Hague Convention, under the terms of the Hague Convention, which specifically delineates custody rights and access rights and may exist rights. And we have all three here. Custody rights were under the terms of the Hague. Now, we have to understand that this was analyzed under the terms of the Hague and not just New Jersey. Under the terms of the Hague, wasn't the Spanish court required to apply the law where the child habitually resided? Yes, Your Honor. And they did, in fact, do that because they analyzed the parenting agreement. And under New Jersey law, that agreement was valid. But the New Jersey Appellate Division would have a completely different view from the view you just exposed. Well, the New Jersey Appellate Division also held that the parenting agreement valid, but they didn't analyze it under the terms of the Hague. They analyzed it specifically under New Jersey law. And didn't they also point out, Ms. Fiorillo, that the Hague is specifically not intended to adjust custody questions? That's not what it's about. It's not what it's for in the law. I mean, there seems to be plenty of precedent out there that says, if you're purporting to adjust custody rights under the Hague Convention, you're doing something the Convention was never designed to do. So I'm a little lost. You keep saying the custody was analyzed under the Hague. I was under the impression that the Hague doesn't have anything to do with custody. Your Honor, the Spanish courts determined who had the right to custody, the custodial right to custody, not custody. And Spanish courts determined that Ms. Carrascoza had the right to custody and that Mr. Emmons had rights to access, and that the Spanish courts would be the appropriate forum to perform a custody hearing. Because I'm confused. When you say they didn't decide custody, but they decided custodial arrangement. They decided who would have the right to custody at that time. And under that deciding custody? No, Your Honor, because deciding custody would be having to have a hearing, testimony, psychological reports, which should be done after they determine whether or not there should be a return. And they determined that there shouldn't be a return. Perhaps there may have been a breach of access rights. It sounds like custody means whoever has the child at that moment. No, Your Honor, it means custody... I mean it would, but it sounds like what you're saying, that that's what the Spanish courts, that's how the Spanish courts viewed custody. The Spanish courts analyzed the parenting agreement, that Ms. Carrascoza was the custodial parent and that she had the care over the person of the child and the right to determine her residence. She made most of the decisions, day-to-day, everyday decisions. That's the same way it would be defined in New Jersey. Let me ask you a question, because your time moves on, and this is an important case, we'll give you whenever time is necessary, but this is a habeas case, and what you are seeking is a grant of her habeas petition. Yes, Your Honor. Well, do you not have to establish that the highest court in New Jersey that has ruled in this case, the appellate division's decision was contrary to established federal law? Or that it was an unreasonable application of federal law? I don't believe that the appellate division's decision analyzed the hate proceedings. The appellate division's decision was an appeal from a divorce... I'm not sure that it had to. It's still a habeas application, and you still have to show that the decision of the New Jersey court was inconsistent with federal law. I believe that it was inconsistent with federal law, Your Honor. How so? I believe that the Spanish court correctly determined that Ms. Carrascoza had the right to custody and that Mr. Ennis had the right to access an innate axiate right. We're talking about federal law as determined by the Supreme Court. How is the New Jersey court's decision contrary to federal law? How is the New Jersey court's decision about New Jersey law contrary? Because Spain was the appropriate forum to hear the hate proceeding. I don't think that there's any... I think that we're all in agreement there. But the New Jersey appellate division wasn't the forum to review the Spanish court decision, nor was the family court the forum to review the decision. That may be so, but you're still proceeding on a habeas petition, and our scope of review is very limited with regard to that proceeding. Well, when we look at the... I think that the appellate division did err in the fact that Ms. Carrascoza was denied substantial due process rights at the trial court. She had, let's see, without going into it at some length, when you say she was denied due process rights, as I reviewed this record, the impression I got was that the New Jersey court bent over backwards on multiple occasions to give her an opportunity to comply with what that court certainly believed to be lawful orders, and that at virtually every turn, Ms. Carrascoza declined to do that. When ordered to provide even something as minimal as telephone access for Mr. Ennis to speak to his daughter over the phone, the court found that she frustrated that, refused to do that. That when she tried to change lawyers at the last minute and sought an extension, the court said, you've had years to prepare for this, and we're not giving you extra time, 600 days. Where's the denial of due process in this that you can point to specifically? Because we're getting one stream of it from the New Jersey court. What's the factual circumstance you can point to, Ms. Villegas, which said she had a right here and the court wrongly denied it? Well, I think that the most important part of it was when, after Spanish Court No. 9 decided the Hague petition, Judge Torres dismissed Mr. Ennis' complaint for divorce as it related to custody and parenting time and child support. So the trial court effectively dismissed the complaint, gave comedy to the Spanish court proceedings, and then when the Spanish court ruled on a separate and related action, a nullity action, but certainly didn't overturn themselves, the New Jersey courts reinstated the action. There's no explanation for that. When Spanish Court No. 10 ruled and affirmed Spanish Court No. 9's decision to refuse the return remedy, Judge Torres continued with the case and specifically barred Ms. Carrascoza from participating in this cross-examination of witnesses, testifying at the hearing, denied a right to continuance. There were many things that went on in the trial. When you say, get specific with me. She was denied the right to testify? Yes, she was. I thought she invoked the Fifth under advice of counsel. Well, first she was denied the right of cross-examination. Excuse me, Judge. Her attorney wasn't permitted to cross-examine the witnesses. Al, you can give me the appendix for that. Your Honor, I do not have a transcript from the trial court in my appendix. Could you send us a letter supplying the information that Judge Jordan has requested? If I can just refer my brief, I can point something out, Judge. All right, time is running. It might be better just to send a letter referring us to a portion of the appendix that provides that information. Your Honor, the New Jersey trial court did refuse to allow Carrascoza to present evidence or testify or cross-examine in on the issues of custody. Judge Jordan was asking for the reference. I don't have the reference, and I will provide that, but I know that did occur. Right, and you're going to need to be real specific to it because when you say it, because I've just heard you say it again, Ms. Piero, that the New Jersey court wouldn't let her testify. And I'll repeat to you that the record that we've got indicates she declined to testify invoking the Fifth Amendment, which is a huge difference from saying that the court refused to let her testify. So when you provide this letter, please be specific and precise. She also wasn't allowed to even have her attorneys cross-examine the witnesses. That's what I'm looking for some citation on. Ms. Piero, Judge O'Neill has a question. Counsel, correct me if I'm wrong. I thought I heard you say that the Spanish court did exactly what it was supposed to do under the Hague Convention. That is, it examined whether under New Jersey law your client had custody of the child. Is that what you said? It examined which parent had the rights to custody, not the actual custody. But you said under New Jersey law, did you not? I indicated that they examined the parenting agreement, which was found valid under New Jersey law. Right. But did the Spanish court consider in making that decision anything other than that agreement? Did they consider the New Jersey statutory law about custody of the child? Well, certainly statutory law would include examining any orders or agreements which were binding on the parties. Since that agreement was binding in New Jersey, that's exactly what the Spanish court should have examined. If they just went to plain statutory law, it would indicate that both parents would have to have custody rights. Excuse me for interrupting you, but I want a direct answer. Did they really cite or refer to anything in New Jersey law other than their interpretation of that agreement, which they said was valid under New Jersey law? Not in the specific decisions. I don't know if it was brought up in the actual hearings, but not in the specific decisions. Okay. Thank you. You might help me out with the disposition in this case. You have filed a habeas petition. You are seeking a grant of the habeas petition on the basis of what? Maybe you can finish that sentence for me. That the contempt orders for which Ms. Carrasco is incarcerated should be vacated. There are more than two opposing orders in different districts, different jurisdictions. The appellate division of New Jersey chose not to vacate those orders and, in fact, affirmed the judge that issued those orders. Don't we look to the appellate division's decision and its rationale in deciding whether to grant your habeas petition? I believe that this is a federal issue. This is a federal issue under the Hague Convention. This is a Spanish court ruling, two Spanish courts, an appellate division and a trial court, and we have the New Jersey courts. I think that the federal courts are the only body who can rule on this, Your Honor, because it's an international question of law. Thank you, Ms. Fiera. Thank you. Thank you. Your time is up. Mr. Shestak? Good morning, Mr. Shestak. Good morning, Your Honor. My name is Jerome Shestak. I'm here as amicus, but I'm also going to be sharing the argument with my colleague. I thank the court personally for the opportunity. Amicus doesn't usually get the opportunity to argue, and I appreciate that. It's rather a symbolic event for myself. I first appeared before this court 50 years, 55 years ago, and since then I've been before this court some 40 times. I fear this may be my last appearance before the court, so it has a certain symbolic significance to me. Judge Fuentes, you asked the question, what was it that violated federal law, violated due process, and Judge Jordan, you asked essentially the same question. Well, the best answer to that is one that you gave, Judge Fuentes, in the McCurdy v. Dodd case. You said in any custody hearing, the Supreme Court held that you can't violate the mother's substantive due process right. Liberty, interest, and issue in the case is the interest of parents and the care, custody, and control of their children, and you went through that. And, Judge O'Neill, you did the same thing in the other Dodd case. A whole recitation of the liberty, interest, and the custody proceeding. The statement still sounds pretty good. The custody proceeding. Mr. Shestad, the statement still sounds pretty good to me. You've done this for a long time, Your Honor. But the question is, where was there a violation of federal law? How was the, I look at the New Jersey decision because this is a habeas case. Our scope is very narrow in viewing habeas petitions. I'm going to try to answer that question, Your Honor. First, there's no evidence permitted by Maria. She was limited to arguing the jurisdiction issue. Jurisdiction issue is only one issue. The main issue is the well-being of the child and the liberty interest of the parents. That's what we're protecting, the liberty interest of the parents. She refused to continue this for no really good reason. The court's calendar may be delayed a couple of years in getting the decision anyway. He made the initial remarks against her. He said, she's thrown away. Mr. Shestad, when you say no really good reason, would you respond please to what the New Jersey Appellate Division said when it remarked that her counsel was essentially fired on the eve of trial and she picked new counsel and started to proceed pro se, and the court told her we're going to move forward and she chose to do that and then hired new counsel and was told, apparently, in view of previous delays in bringing the matter to trial, amounting to nearly two years, that no further delay would be counted. Now, when you say no really good reason, it looked like that court, according to the Supreme Court Appellate Division, thought two years in getting to trial is long enough and we've been waiting for you, Ms. Carrasco. So that's the implication. What's wrong with the court saying two years is enough when we've laid a delay at your door? Well, normally there's nothing wrong with it, but when you're dealing with the liberty interest and you have new counsel and you make some kind of adjustment, you have a week's continuance or a two week's continuance, it took a long time for them to decide the case and then there was one hearing after another hearing, you know, sure you could be a martinet and say, no, I've waited long enough, we've got to do it, but you're talking about a liberty interest here, and a liberty interest deserves some accommodation, and it doesn't deserve presidential remarks. There's another point you're on. He said, Judge Torek said that the custody was already decided. He wasn't going to argue custody. He said it was decided by the prior judge. Well, it wasn't decided. Most of it was a temporary order, and in fact in the temporary order by Judge Parsons, she had custody. So he's wrong on that. And then he gives total custody to Mr. Innis, who's not even requested, as a punishment. That's only part of it. Are you referring to physical custody as opposed to legal custody? Well, I'm referring to the custody she had was, I guess, she had both physical and legal custody. Did she have custody? On a temporary basis. Did she have custody under an order of the Jersey State Court? She did, actually. She served an order by Judge Parsons on, I'm thinking of Robert J. Inns. You're asserting she had sole custody, not joint custody. At that time, she had sole custody. Then in the court's hearing, he asked for joint custody, and then the court, as a punishment, gives him full custody. That's only part of it. I don't have anything in my, I've got a pile of papers here, but nothing to suggest that she ever had sole custody of Victoria from a Jersey State Court. Well, if you look at the talk table that Judge Tarrigan attached to his order, in one of the orders there, she shows her as having that custody, and I'll try to find a copy of that before I'm through. But it's in his little addendum where he attaches a time of all the proceedings, and one of them shows her as having custody of the decision by Judge Parsons. So, but let's get to the executive order. Let's get to the excessive order. He says to her, she's got to dismiss her actions in Spain, which is inconsistent because he wants her to go to Spain and tell the court to release the child, and so she has to dismiss her actions in Spain. She has to prior her Spanish counsel. There's a fine consideration, no consideration of actual damages. It's actually a punitive of $148,000. I'll leave it on property. I'll fine her $500 a day. And I want to state there's chance for Viva. I promise. Mr. Shepnick. Mr. Shepnick. I know you've been here 40 times, sir, and I apologize, but I get the tenor of your argument. I would like you to speak specifically to something I want to ask you, though. When you say this is punitive and not representative of any actual damage, the record appears to show that Ms. Carascosa was repeatedly violating orders of the New Jersey Superior Court and that there were sanctions imposed short of imprisonment in an effort to get her to comply with what that court viewed as lawful orders. Now, I want you to explain as a legal matter how it is unlawfully punitive for a civil court to impose sanctions in an effort to obtain compliance from a recalcitrant litigant. Because sanctions have to have some relation to what you can pay. She couldn't pay $148,000. These sanctions have been worth $100 a day, and then all of a sudden there's a penalty put on them, $148,000. It wouldn't satisfy the due process under any of the Supreme Court guidelines for due process for punitive damages. It has no relation to compensatory damages, and even if you can have sanctions that are severe sanctions, this kind of a thing is out of line. It's totally impossible for her to comply with it, plus a lien on her property. He was punishing her is what he was doing, and it was pretty clear that this was not the best interest of the child. There are two things that are involved in here from a due process viewpoint. The liberty right that she has to have her case presented, no matter how it's presented, even if she is an obstacle herself, the court has an obligation to get her best interest in there, the parent's best interest. The second one is the best interest of the child. There are best interests of the child involved here. What decision did Judge Torek have? He gave a letter several months later explaining the decision. No findings of that, nothing that you can appeal from. Can I ask you something about that, too? You're here in the rule of amicus on behalf of the court in Spain, right? Yeah, I'm going to get on to the International Act. All right. But I responded to your inquiry, Judge. Right, and I appreciate that. In that Spanish proceeding at some point, a psychologist retained or acting on behalf of the court conducted an evaluation of Victoria, and if I read the record correctly, and please correct me if I'm wrong, that psychologist made findings that included that Ms. Carascosa was acting against the best interest of the child, that she was destroying the relationship between the father and the child. You're wrong. That she was being negative, et cetera. There are two psychological reports. That report you mentioned said what you said it did. She challenged that report as being inaccurate and not the correct translation and on other grounds. She also had a psychological report which said that the best interest of the child should be with the mother, and that's in the NASA papers. The NASA papers is before this court really defies any argument, I'm sure, defies the court. But it's all there, and the psychological reports go both ways. Well, there's my question. The court's duty to find out what he thinks is the best interest of the child. That's what I'm trying to ask you. The appellate division seemed to credit the efforts of the trial court, and in the course of doing that quotes this information from the Spanish court. So when you say there was no effort to understand the best interest of the child, how do you square that with the New Jersey courts discussing the psychological report produced in Spain by Spanish psychologists? I don't like to criticize the New Jersey court. The opinion of the appellate court was some 60-some pages, 85% of it was just a recitation of facts. They sloughed off the legal arguments in the way that this court has sent back cases to the district court, saying you can't just have conclusions. You need to have reasons before you have summary judgment or a decision. The psychological report, as far as I know, was never put into evidence in the sense that it was authenticated. They may have referred to it, but she had a different psychological report. In any event, there's no testimony that the court either examined the psychiatrist or brought a psychiatrist or a psychologist into it or really had any kind of examination as to what is the best interest of the child. Awarded custody to him. It was even against his wishes. He didn't ask for joint custody. He asked for full custody, and he asked for joint custody, and then full custody. It was so clearly punishment and aggravation. She's not an easy person.  The court is supposed to resist that and not punish someone when you have a liberal interest involved and you have a best interest in the child. Let me get to the comedy issue, because there's another question on that. When she took the child to Spain, there was no violation of an order. She was not in any violation. Under the Hague Convention... Wait a minute. Even the parenting agreement said you should not remove the child without my consent. Did she not agree? You have a New Jersey law that's saying that you shouldn't take someone out. But that law has been interpreted in terms of what is the best interest of the child. It's not an inflexible law. But Ms. Fiero says that the parenting agreement is a valid document, and so does the New Jersey appellate division. Doesn't the agreement say you should not take my child from the jurisdiction without my permission? It does, in the accident part. Now, that's what the Kroll case dealt with. The Kroll case, the Second Circuit, by a very good judge, Judge Jacobs, said that where you have the Hague Convention... What the Hague Convention does, it does two things. Rights of custody and rights of access. Now, you're not making the same way New Jersey defines custody or the same way New Jersey defines access. But that's the way the Hague Convention does it. This is right of access. He had right of access. He did not have rights of custody. She had the rights of custody. New Jersey courts disagree with you, don't they? New Jersey courts disagree, because they disagree with the Hague Convention. And why do they disagree with the Hague Convention? Let me get to that, because it's a key point. They said it's against the public policy of the state. Now, what is the public policy of the state? You might say, well, the public policy of the state is that the parents work together. That's a good public policy. That's not the public policy. The public policy was who files first. They said that Mr. Innes filed first. If she had filed first, New Jersey would have taken custody. So what kind of policy is that? To get to the heart of the matter, when Kroll, the mother, had an order giving her full custody. But that doesn't seem to be the situation in our case. So how is Kroll applicable? How does that help you with the issue? I mean, it's true she had true custody. But the question is, what is the effect of a NAIA exit? Does a NAIA exit provision give you custody? And what Judge Jacobs said there, it does not give you custody. And he had a very good reason, a very learned opinion. There's a good cassette there, too. But he had a very good opinion interpreting the law. The law there, the Hague Convention, is really different than New Jersey law and other laws. It says rights of access means this. And it defines it. And it says rights of custody means this. And she did not violate the rights of custody. All the Spanish court said was not that she had custody, but that the child was there and that Spain has the right to decide the custody. So that's where Judge Devereux has done it all wrong. He said that the Spanish court had decided custody. They most clearly did not decide the custody. Doesn't the Hague Convention say that where the child habitually resided is the proper jurisdiction to decide custody? Pardon me, sir? Doesn't the Hague Convention say that it is the state or jurisdiction where the child habitually resided that is the most proper place to decide custody issues? It does say that. But then there are exceptions to it. And one exception is in Article 19 and 20. And that's a very key point which was basically ignored by the New Jersey courts. Well, I don't know that it was ignored. I think if I read the record right, it was stated that there was no evidence in the record to support any exception to the standard rule about habitual residence being the proper place for the decision on custody to be made. I mean, it's not that they ignored it. They addressed it and said there's nothing in the record to tell us that anything other than the standard habitual residence of the child provision should be the basis for where to decide custody. It's not an issue of habitual residence. The habitual residence was in the United States. The question is what does the Spanish court decide? The Spanish court decides who should the child be. If it's a wrongful return, it goes back to New Jersey. If it's not a wrongful return, then the custody issue is decided in Spain. They have not yet decided the custody issue. All they said was that it has to be decided in Spain. Why? Because the Article 19 of the Spanish Constitution says that you have a free right to travel, and it's against the Spanish constitutional human rights and whatever other civil and political rights to take that away. Mr. Shostak, doesn't that turn the Hague right on its head? The Hague says the habitual residence of the child, the law of that forum, will decide who gets to pick where the custody is and that the Hague Convention is designed only to preserve the status quo and how that can get worked out. What you're suggesting to us is because there's a conflict of law between New Jersey law, which says very clearly in the statutes and decisions that there are joint rights of custody in the parents and that you're not to remove the child in derogation of those rights, and Spanish law, on the other hand, which says there's a right to travel, that the Spanish court gets to decide the custody issue. That's what I hear you telling me, is that the Spanish right to travel trumps New Jersey law. And if that's true, it sounds to me like you've taken the Hague Convention and inverted it. No, it's just that for the Hague Convention to apply, it doesn't have to be the same as New Jersey. If it were the same as New Jersey, there would be no litigation. It's a different result. And the public policy of New Jersey government, as Judge Cardozo mentions, when the public policy involves some issue of deep policy or morals or justice, it doesn't. The only public policy was who files first. If she had filed first, and she said she did, but the court said she didn't, if she had filed first, New Jersey would have taken jurisdiction. That's the public policy as far as we're surprised at. I'd like you to finish up, Mr. Shostak, because we've got to get to your address. Article 20 of the Hague Convention says that the return of the child can be refused if it involves the protection of human rights and fundamental freedoms. That's what the Spanish court did. That's exactly what it did. That Hague Convention would never have been passed without Article 20. Your Honor did an interpretation of the Torture Convention. You know how interpretations go. That interpretation is very important for human rights as the Spanish court sees it. And that was just ignored. One of those human rights is the right to travel. Now, you can have individual residence, but that trumps it. That's what Article 20 does. It's a different result than New Jersey, but a different result doesn't mean you don't follow the Hague Convention properly. I want to thank you, Mr. Shostak, for your argument. Before you step away, just tell me what it is that you are requesting in this case. What are you requesting in this case? I know you're arguing the district court's position. Are you asking for a reversal of the district court? Are you asking for a grant of a habeas petition? I'm asking for a grant of a habeas petition, yes. And whatever she has to pay, she pays it. Okay. Thank you, Mr. Shostak. Mr. Van Ollen? I gather you're all representing different arguments. You're not going to repeat the same argument. What are you addressing? I'm going to be—may I please report, Your Honor? I'm Peter Van Ollen, representing the appellee, Peter Innes. I'm going to be addressing the argument in reference to comedy, whether comedy should be granted or not. I believe my colleagues will be addressing the issue of the standard of review. Mr. Van Ollen, is anybody going to be able to specifically contest with citations to the record Ms. Fiero and Mr. Shostak's assertion that she was denied an opportunity to meaningfully participate in the hearing because she wasn't permitted to cross-examine witnesses, et cetera? Your Honor, I was at that trial, and I was frantically looking through my notes, seeing if that was so. Honestly, I can't tell you whether that's so, but I do have an argument in reference to that. If that was so, why Judge Turek decided that that way? As was stated in my brief, she was ordered for an evaluation, a custody evaluation, which all parties were, which is fundamentally important to have a custody evaluation if you're going to have a custody battle, if you're going to have a custody hearing. In fact, I specialize in matrimonial law, and you need a custody evaluation to decide custody. And she was ordered for it. She was ordered to appear, and she did not appear. Then Judge Turek was told that she was ill, and Judge Turek bent over backwards. And for my first time in 15 years of practice, I heard that she was allowed to participate, have an evaluation over the phone. And we actually even consented to that, against my better judgment, because the evaluator needs to see the parties. She didn't comply to that. Now we come to the trial. Now, without a custody evaluation, it would be a violation of Mr. Ennis's due process rights, and not in the best interest of the child. To allow her to participate in a custody battle is after the court numerous times bent over backwards to have evaluation in order so she could participate. But she did not. She again and again said to the court, through her actions, stated, I'm not going to comply. Then she comes, the date of the trial, and then she's the one who invokes, as you stated, Your Honor, her Fifth Amendment right. And she requested an adjournment, and Judge Turek at that point states that, when you bring back the child, and I started to read the record, I can't cite you indefinitely, I started to say I would have no objection to an adjournment if she brings back the child. What was the nature of this proceeding? Was it a custody hearing? It was a divorce custody, and the issues were together. They weren't bifurcated. Was there ever an order with respect to custody? No, there was never, and thank you for bringing that up. There was never, ever an order granting the appellant sole custody or any type of custody. In fact, Judge Parsons at one point ordered the return of the child, and I believe at one point my client was granted custody, but she was never granted custody. My client was granted custody, I believe, in the motion after the child was, I want to make the representation it was before the child was removed, it was after the child was removed from the state of New Jersey. And in reference to best interests, and they mentioned this, and I am able to recite something in the record. Judge Turek, when he made his decision in reference to custody, went through the statute in reference to custody, because the bottom line in the custody battle is what is in the best interest of the child? And Judge Turek, 5T105,13-110,21, goes through each of the factors in his decision rewarding custody. In fact, in my examination of misdemeanors, I went through most of those factors, and Judge Turek, in his decision, went through each of those factors. So she was granted as much due process as she allowed. She created the situation. And my esteemed colleague stated that it was an issue of liberty. It was an issue of liberty. Well, it wasn't an issue of liberty at the time of the trial. She made an issue of liberty. And it wasn't a punitive, you know, the sanctions, the fines, were not punitive in nature, because she, you read the final judgment of divorce, the sanctions went into effect, and the arrest warrant went into effect. I believe it was within 10 days. She was given 10 days. Her passport was taken that day. But she was not arrested that day. Those sanctions didn't go into effect that day. She had 10 days to comply, and she was ordered not to leave the jurisdiction. Well, she obviously left the jurisdiction because months later she was arrested in New York City. So she's the one who made it a liberty issue. Judge Turek did not make it a liberty issue. Through her actions, she made it a liberty issue. You were going to address the comedy issue, whether the Spanish court's decrees are entitled to deference. Yes. In reference to the comedy, in order to determine comedy, a court has to determine whether those orders are fair and reasonable. And in determining that, they have to look to see if it violated public policy or prejudices the rights of a citizen. In this particular case, the Spanish court's decision violates both of those. Which decision? Because there are multiple decisions from more than one court. Which decision are you talking about? I would argue both decisions. The original Hay decision and the Neopel decision. In reference, both of them ignore New Jersey law. You stated, Your Honor, that under New Jersey law, you have equal rights of custody. Before an order is put into place, both parents have equal rights. It's like a joint custody arrangement. And Spain ignored that. Why can't I say, Victoria is a Spanish citizen. She's here in Spain. I can decide the custody issue. Because she was wrongfully taken from New Jersey. And not only New Jersey says they have equal rights. New Jersey has a statute to prevent exactly what happens. And under that statute, neither party are allowed to remove the child from the state of New Jersey without a court order or consent of both parties. That didn't exist then. And she removes that child from the state of New Jersey. The Spanish court viewed the parenting agreement as giving her custody of Victoria. And it did not. In fact, that agreement was an interim agreement. Before any divorce complaint was even filed. Before any orders were filed. And nowhere in that agreement awards her custody. And it has equal restrictions. It says neither party can remove the child 90 miles from Fort Lee. Both parties have to have access, phone access, when they have possession of the child. It goes right down the line. I believe if this court decides that that agreement created custody, then it will have a chilling effect in custody actions throughout the country. Especially in New Jersey. Because you would be afraid to enter into any agreement to say that that wouldn't give you equal time. Because then if you enter that into that agreement, that gave the other party a little more time than you had. Then you run the risk of then being able to remove the child from the country in violation of New Jersey law. And then get away with it. Why don't you respond, if you would, Mr. Van Alten. To the assertion by Mr. Shestack that Spain was enforcing fundamental rights under the Spanish Constitution. And therefore, under Article 19 of the Hague, they were properly making a determination which should be respected by this country and the courts of this country. I have two arguments against that. A, Spain, it seems that they made that argument. They made that argument, which they could make that argument. But they made that argument completely ignoring New Jersey law. And to do it to the extent they did, violates the spirit and the nature of the Hague Convention. Because they're not supposed to ignore New Jersey law. As you say, they can't trump New Jersey law. And they actually use it to trump New Jersey law. The other thing is that the agreement, the October 8th agreement, does not restrict the appellant's ability to travel. It restricts the child's ability. She could still travel. Now, you can make your argument about she being Ms. Carrasco. She was free to go wherever she wanted. She just wasn't free to take the child overseas. And that's your point. Correct. Mr. Van Alten, if you win this case, nothing happens. No, Your Honor. I don't believe that's so. All right. Then tell me what happens. All right. Of course, things continue. And I think... But she stays in jail? She stays in jail. Victoria stays in Spain. And your client doesn't see anybody. No. We'll see Victoria. I think over time there could be... I think the appellant is looking at what this court does. And if this court does not rule in her favor, hopefully she's going to reconsider her situation. And, you know, I was expecting the question, how long can she stay there? And how long can the court hold her there on the contempt order? Well, the cases are not clear. That's a matter for the state court. It is a matter for the state court. And, you know, it states that, you know, at 18 months, there are some cases in New Jersey, at 18 months there has to be review. We are not at that point. And there are some people who in New Jersey cases that have violated these types, not exactly this type of order, but contempt orders, have been in jail much longer than she has. It is a matter for the state court unless we grant the habeas petition. It is a matter for the state court. Correct, Your Honor. Well, unless we grant the habeas petition. Unless you grant the habeas petition. And on what basis should we deny the habeas or grant the habeas petition? Your Honor, I believe you should deny the habeas petition because New Jersey law, their holding of the appellant is completely legal and completely in line with the Hague Convention. And my client is a father. He has been without his child now for almost three years. And this court has an obligation by the jurors to protect the rights and not to purchase the rights of a U.S. citizen. And his rights are being violated. And his only hope, we believe his only hope of ever having his child brought back up here, which he has been denied, is if she stays in jail until she complies with law. Should she comply with court orders? Should she comply with New Jersey statutes? How would she comply, though? As I understand it, she would have to make an application to Spanish authorities for a passport for Victoria. Is that right? Has she done that? No, she has not. And she claims impossibility. And here's the thing about the impossibility. I know I'm out of my time. The impossibility argument reminds me of a situation with my father growing up. My father wanted to teach me to learn how to ride a bike. And I said, no, I can't. I got scared. And he said to me, how can you say that? You haven't even tried. And the appellant is arguing it's impossible for me to have the passport released. But she's never even tried it. But take my analogy a little further. If I went to my father, I want to teach him how to ride a bike, and I take the wheels off the bike. And I say, no, it's really impossible. Well, that's what she's doing. She's actually fought these applications to remove the passports and lift the restrictions. She has fought them. Now, the last court's decision, I think on June 18th, stated that they may come to another decision if she made the application. Now, in my motion, I said they would come to another decision. My officer argued and said, may. But that gives a strong indication there's no impossibility argument, especially if she doesn't even try. I'm out of my time. Yes, Mr. Randolph. Thank you very much. Thank you very much. Ms. Cotugno? Did I pronounce that? Cotugno. Cotugno. Ms. Cotugno. May it please the court. Are you addressing the standard of review? I will be happy to address the standard of review. Well, I thought that was Mr. Vanellis. I will. I surely will, Judge. I'm here today as an assistant prosecutor for Burton County, New Jersey, appearing on behalf of the prosecutor, John Molinelli. Our position, the FLE's position, as to the standard of review, is that this is a habeas case, an appeal from a habeas denial, where there was no hearing held below. So that the standard of review here, of course, would be de novo. However, as Judge Wentz, as you pointed out, it is a rather limited review that your honors have here today, unless, of course, the appellant, Ms. Carrascosa, can show by clear and convincing evidence that there was an error in fact, by the appellant division in the New Jersey State Court, and the factual findings, you should, we urge, adopt those factual findings as found in Ms. V. Carrascosa. Similarly, of course, as the habeas petition was denied at the court below, unless, of course, that was done, I'm sorry, that the appellant had been incarcerated against the law of the Supreme Court of the United States, or in a decision that is an unreasonable determination made by the state court. Well, do we, it seems like we can do, we can go in two different directions. We could look at Judge Debevoise's decision, and we could say that it was wrong for any number of legal reasons, and reverse that decision, I suppose. I don't know what happens then if the case goes back to him. We can take the other avenue and look at it as a habeas petition, which I think is what we've got before us, and then determine under habeas standards whether the New Jersey decisions were contrary to federal law, or an unreasonable application of federal law. I mean, do you agree with that? Is that the way you look at it, or is there any other way of looking at this case? No, I don't believe there is any other way of looking at it. We believe this is a review of a habeas petition. I believe that the standard here is a plenary review. You can do either of those two things. But no, I agree, Judge, there is no other alternative. So what if we were to go the other way and just look at Judge Debevoise's decision, and we were, I suppose if we affirm, we affirm, but what if we disagreed and reversed the decision? If you were to reverse Judge Debevoise's decision and remand it back to Judge Debevoise? Yes, exactly. Well, it's a difficult question to answer for two reasons. The original denial of the habeas corpus petition was appealed in a timely fashion. The notice of appeal was filed in a timely fashion. Subsequent, of course, to Judge Debevoise's original decision, the appellate division issued their decision, which was available to Judge Debevoise on the reconsideration motion. There was also a notice of appeal to this court filed on the reconsideration motion, but that was filed out of time. And I believe that that was a question that was left open to your honors, for your honors to determine whether or not you were going to be entertaining an appeal after the motion for reconsideration as well. I would suggest to you, Judge Fuentes, that to send this back to Judge Debevoise, quite frankly, would result in... Well, he wouldn't be too happy, I suppose. That may be the case, but he's already decided this case, quite frankly, twice. He decided it in the initial application, and he decided it again on reconsideration. And at that time, he had the benefit of the appellate division's decision. We, of course, would urge the court to affirm Judge Debevoise's decision where he denied the appellant's petition for the writ of habeas corpus. The other issue that I want to bring to your attention, as I'm sure you're aware, is very unusual for a prosecutor to be involved in what is often characterized as a custody dispute. The conduct by Carrascosa in this instance, however, not only violates provisions of the family law, but violates provisions of New Jersey criminal law. And that's why, in this matter below, Prosecutor Mullinelli moved to intervene in this matter. As the record shows, there is a criminal indictment here. Carrascosa is charged with nine counts, eight of which are categorized as second-degree crimes in the state of New Jersey. I'm the assistant prosecutor charged with the responsibility of prosecuting that indictment. Then she's not being held merely to coerce her cooperation with bringing Victoria back. Is she held on the criminal indictment as well? She is, Judge. However, bail has been set in the amount of $500,000. She has not posted that bail. However, if her incarceration or if Judge Torak's order incarcerating her for coercive purposes were to be lifted, then, of course, the bail would remain in effect, and she could make post that bail and then be released. That would be incumbent upon her. But one of the things I just want to bring to Your Honor's attention— Let me ask you a question before you go on. Of course. At some point, is it incumbent upon the prosecutorial authorities of New Jersey to say, I guess I'm asking, is there a speedy trial issue here? In other words, it would seem problematic for the state to hold her in civil contempt for an indeterminate period of time while there are criminal charges stemming from some of the same factual foundations and then seek to impose criminal sanction on top of that. Would you agree that that raises some issues for concern? I agree. If she stays in jail for—well, maybe you could tell me, what's a typical sentence for something like this? Is there a typical sentence? Well, Judge, the statutory sentence allowed on a second-degree crime would be anywhere between 5 and 10 years incarceration in a New Jersey state prison where she convicted on one of the counts of interference with custody. All right. Are there sentencing guidelines for the state of New Jersey that would indicate a sentence range? Something less than that? No, that would be the range, 5 and 10 years. And there are—the sentencing court would determine mitigating and aggravating factors and fashion a sentence within that range. And would she get time served credit for time served on a civil contempt? Not on a civil contempt, but the entire time she's been held on a civil contempt, she's also been held in on bail, which would give her time served. So she would get that time. And the only thing I'd also like to point out is that even if this court were to reverse Judge Deverwood's decision or vacate Judge Torak's order, the indictment against Ms. Karaskoza, at least in part, would continue to stand. There are eight counts of interference with custody. The first four counts of that indictment do not require her to have violated any court orders. So even if this court were to find that Ms. Karaskoza did not violate the court orders issued out of the family division, either issued by either Judge Parsons and then subsequently Judge Torak, her behavior prior to any judicial involvement in New Jersey or in Spain violates the New Jersey Criminal Code by taking the child, concealing the child's whereabouts, detaining her, taking her out of the country, and depriving the co-parent of parenting time. So I would submit to you that the indictment would stand and the bail would remain as well. Very good. Thank you for your argument. Ms. Pesquale? Good morning, Your Honor. I'm perhaps even, I don't want to say further removed because we do have a stake in this case, but my name is— Who do you represent, Mr. McGuire? Exactly, Your Honor. Who is— The Bergen County Sheriff holding Ms. Karaskoza. The jailkeeper? Yes. So we didn't become involved in this case until the, actually last January. There was an emergent habeas corpus application and that's when we became involved. So the procedural history preceded our involvement. We're almost a ceremonious, for lack of a better term, defendant in this matter. Aren't you really a stakeholder? I mean, aren't you really a stakeholder? You have custody of the person who, if you're ordered to produce them, produce the lady, you will. If not, she'll remain there, subject to the order of the New Jersey court. Absolutely, Your Honor. So you really have no particular interest in this proceeding, do you? Other than to support our county prosecutor and the laws of New Jersey, no. Actually, no. I'm the warden, essentially. However, what we'd like to remind Your Honors is that when Judge Debevois, on the initial application for habeas and on the motion for reconsideration, when he considered these cases, this case, both times and after considering the New Jersey Appellate Division decision, he did so, so carefully. I mean, his recollection and, like Your Honors, his recall of facts and events and the timeline in this case was, I think, at one point, better than her own attorney, who had lived with it for quite some time. So I always say that to just hit home the point that he did, in fact, have the best interests of the child in mind. He did apply the Hague Convention. I guess I'm just rounding everything up. He did apply the appropriate standard of review and carefully cited to the appropriate portions of the procedural history prior to making his final carefully considered decisions. So while, again, we're only the holder of Ms. Carrascoza, we do support our prosecutor. Ultimately, we are interested in our New Jersey residents and their rights to their custody, their custody rights to their children. And if I can answer any other questions, I don't want to belabor the points that I feel that my colleagues really fully addressed in this matter. Yeah, we always wonder about the best interests of the child. I'm not sure that the status quo is going to serve that, but it's not our job to review that. It's a state court issue. We're hoping, Judge. Everybody has their breaking point, and I feel the longer she's incarcerated, perhaps the coercive incarceration notion of civil contempt will breathe life into that statute. Thank you. Thank you, Judge. Okay. Yes, sir. I have a question about the new custody order. Page 186A of the record to be submitted is a bench memorandum by Judge Torek. On November 22nd, 2004, he entered an order. The wife is granted exclusive use of the house, temporary custody of Virginia. That order was never turned around until eight years later when the divorce was finally issued. Could you give me that again, please? It was 186A. It said, W-5, P-R-O, with Parsons. And then it said, W, meaning wife, granted exclusive use of house, temporary custody of Victoria. Returned 2007-04. And that's on 186A of the record. When she took the child to Spain, it was not a violation of law. And the point that seems to be missed is in Article V of the Hague Convention, rights of custody shall include the rights relating to the care of the person, of the child, and in particular the right to determine the child's place of residence. That was hers. That was hers under what laws? Spanish law or New Jersey law? The Hague Convention may be different than New Jersey law, but the Hague Convention is what we're trying to interpret here. And you can do a de novo. The facts are really fairly irrelevant. You have a de novo interpretation of the Hague Convention applied here. And the rights of access are including the right to have a child for a limited period of time. And if you violate the rights of access, there are remedies. But it doesn't mean that you return the custody to the individual residence. What this says is that the custody trial takes place at the location where the child is at the time. And that is Spain. And that's the Hague Convention. And if the court was wrong, both the New Jersey court and the district court, it's saying, well, the Hague Convention doesn't apply in this regard. There also was a public policy. It was not only a New Jersey public policy. The public policy of the United States in adopting the ICARA law, which makes the Hague Convention part of federal law. If you had public policy of every state governed, you'd never have any comedy because every state could find some different public policy. Also, there'd be a dispute. Let's go back. Isn't it fair to say that the public policy of the United States views child abduction as a bad thing and that under the facts that are alleged here, Ms. Carascosa, and undisputed facts, obviously, Ms. Carascosa took a six-year-old girl, put her on a plane, went to Spain with her, and the girl has been there ever since in derogation of the rights of the father. Now, how do you square that with the public policy of the United States? I've got to say, it's hard to imagine a more staggeringly set of self-destructive behavior by Ms. Carascosa. To hear you say that what she's done is consistent with the public policy of the United States makes my jaw drop. I'm wondering how you square that with the public policy of the United States of America. The public policy of the United States is to adopt the Hague Convention. And what the Hague Convention says, really, is she had the rights of custody. She did nothing wrong in taking the child. There was no order against it. He had a right to access. He could have tried to do something with that right of access. Now, let's take the point about him exercising rights. For four months, he did not exercise any rights. From November until February, he never tried to get in touch with the child, never phoned the child. There's a lot of recitations of what he did afterwards, after he went back to the court and got a divorce, to show that he was a good father. For four months, he didn't exercise rights. And if you don't exercise your rights, then you're not entitled even under the Hague Convention. The big deal of sympathy for him evaporates when you see what he really did. And although the court didn't have to go into that, or the Spanish court didn't have to go into that, the facts are there. That for four months, he did nothing. There's nothing on the record to show he went and tried to get an order, to try and get a hearing, to try and get phone calls, or anything. Four months are gone. Now, let me just talk about the other point, the impossibility. The impossibility. Mr. Emerson's lawyer says that what the Spanish court did is that they would decide otherwise if she applied to them. That's not what they said. They said they could. There's a big difference between could and would. I'd like to be on this court. I couldn't be on the court. That's a misleading statement. In fact, if you read that order, what the Spanish court says is there are a lot of reasons why the Spanish court won't let the child go. But, Mr. Shestack, if she makes the request, and the Spanish court refuses to grant it, then we've got an entirely different situation, don't we? Well, the likelihood is the Spanish court would refuse to do it. Why do we have to guess, Mr. Shestack? I mean, this is yet another in a very long series of things reflected in the record where Ms. Carascosa declines to do something that she's being ordered to do, and then says she's victimized. She says, I'm a victim of the hate convention being misapplied to me. And yet, we hear argument from the other side saying, wait, this is the hate convention being applied in the proper way. In this instance, you're saying she's victimized because the Spanish court wouldn't do anything. When we hear the other side saying, and the courts, specifically Judge Debevoise saying, in his opinion, she hasn't done anything to indicate even an effort to comply. His point was the hate convention didn't apply, and he was very dismissive of the Spanish court. He's a great judge, but he was wrong in this case. What the Spanish court said on the impossibility is, any revocation to remove a child against the will of the mother would be a de facto enforcement of a judgment which is not recognized in Spain, which would be seriously detrimental for the defendant's custody rights, and there's no evidence to warrant it. Didn't you just read the words, against the will of the mother? The Spanish court says, any revocation of the prohibition to remove a child to the national territory against the will of the mother. Yeah, that's the pertinent phrase, Mr. Shestak, and what I think your opponents are arguing to us, which is, it's her will that's imposing the restriction at this point. Because if she were to say, it's my will that the restriction be lifted, it's my will that the passports be turned over to American authorities, then that block wouldn't exist to the return of the child. Maybe you can make her go to the Spanish court, but you can't change her will. She doesn't want the child returned, and she has good reasons. She has fears for the father, all sorts of reasons. She's got to convince the court that she changed her will, and once the court stands for it, it's not stupid. They said that there's no reason to keep the jurisdiction in Spain, and they have the jurisdiction, and you find the district court just slumping off the Spanish court as if it doesn't exist, doesn't understand the Hague Convention, when it understands it very, very well. Okay, we have to finish, Mr. Shestak. I just wanted to say, in terms of the remedy, you have a de novo right to look at the Hague Convention de novo. Was it correctly applied? And if you look at Article 5 and then Article 60, it was correctly applied. The situation is the custody should be in Spain. The custody here should be in Spain. How it will come out in Spain, I don't know. Spanish courts are not noted for being unfair to the United States or to anyone else. They're good courts. That's what the Hague Convention calls for. If you don't give comedy, you don't give comedy. That's against the public policy of the federal government and the ICARA. It's kind of the case of first impression for this court. Coral is a case in point, but it's a hard case. It's pretty clear that if you're going to have comedy and you're going to have international law applied, this is the case for it. Apart from the due process arguments, which seems to me a no-brainer in terms of listing all the excessive judgments and the violations of not really taking into account a limited interest. No matter what the court said it may have done, it wasn't done. Thank you, Mr. Shestak. One question. Right. We had a citation to the record for Mr. Shestak reportedly providing sole custody. Do you have something to say about that in the record? Well, my question, Judge, was that Billy Shestak said it was in Appendix PA 186, which is a portion of a transcript. So I don't see what he is referring to in the appendix. However, I'm familiar with the document that he's referring to when we discussed it before Judge Stevens was in the position for proceeding. And the document, which is a sheet that— Is it part of our record? It might have been before Judge Stevens was. I know it was addressed. I do not know, Judge, as I stand today, that it's in these papers. Mr. Shestak, any problem with our getting a copy of the record? No. No. No. Well, why don't you just undertake to send us a copy of the document? You can refer to it. Mr. Shestak has no problem with it. Yeah. The letters. We're going to get letters from both of you, right? I've asked Ms. Fierro for correspondence following up on the assertion about denials of due process with citations to the record. Is it business? It's official time. You're also going to need to provide the transcript. They were divorce trial transcripts that weren't below. I don't believe they were before Judge Stevens was. Do we really need to? The portions of the divorce proceedings are attached to the account brief, and in fact, if you look at PA 181, I believe, it discusses term and location of a Fifth Amendment right not to testify in the divorce proceedings. So there are portions of the transcript attached. Well, we've gotten lots of papers from the folks. I think what we really want is a citation to the record that we've got, if you've got it, to support what you've said, and we'll give the other side, you know, if you want five days to respond, that's fine. Just get it to us so that we can come to a final decision. We just voted today about that November custody order. That was a domestic violence order. Was she dismissed? Before it became a permanent order, in New Jersey, you're given a TRO up to 10 days, and then there's a return date. We're going to have to stop you because you're arguing the case again. We've got enough to make a decision. Thank you. Just for clarification, would Mr. Shustak also be supplying the order to which he's referred, the November order, within 10 days, allowing five days' response from the FLE? I don't know if there's anything to respond to. Mr. Shustak, 10 days as well, supplies for the copy of the order that you have, and then the response is no later than five days. Thank you, Judge. Okay? Thank you. This is a very difficult case. It's a very sad and tragic case, very difficult. We will take some time to look at it. We'll take it under advisement. Thank you all. It was very well argued. Mr. Shustak, good to see you again. Thank you. Thank you all. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.